**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Ravi Marwaha. | ) | CASE NO.  05-cv-2015 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| SBC Global Services, Inc. | ) | Memorandum Opinion and Order |
| | ) | |
| Defendant. | ) | |


**<u>INTRODUCTION</u>**

Presently before the Court are Plaintiff Ravi Marwaha's Motion for Summary Judgment (Doc. 13) and Defendant SBC Global Services, Inc.'s ("SBC") Motion for Summary Judgment. (Doc. 17).  The parties have also engaged in a flurry of motion practice related to their cross-motions, including the following: 1) Defendant's Motion to Strike Exhibits (Doc. 24); 2) Plaintiff's Motion to Strike Exhibits (Doc. 31); 3) Plaintiff's Motion to Strike Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 32); 4) Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment (Doc. 33); 5) Plaintiff's Motion for Default Judgment or, in the Alternative, for Negative Inference Jury Instruction (Doc. 34); and 6) Defendant's Request for Oral Argument (Doc. 62).

1

For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion fo Summary Judgment is GRANTED.  Defendant's Motion to Strike Exhibits is DENIED.  Plaintiff's Motion to Strike Exhibits is GRANTED in PART.  All other pending motions and requests are DENIED.

**FACTS**

Defendant SBC is a diversified communications company that provides services that include voice, data, networking and e-business.  Plaintiff Ravi (Rob) Marwaha is a native of India and a member of the Hindu religion.  He received an M.A. from an Indian university and an M.B.A. from the University of Dayton.  He started with SBC in 1995 as a Senior Account Manager.  The parties do not dispute that prior to 2002 his performance was satisfactory if not above average.

SBC vice president Brian Jump, a Caucasian, became Marhawa's supervisor in 2002. From this point forward, Marhawa believes he was subject to numerous slights and affronts. Jump accosted Marhawa in the SBC men's room regarding a commission overpayment and Marwaha claims he was treated differently than Caucasian co-workers on conference calls. Jump also failed to conduct a formal performance review of Marwaha.  When Marwaha started under Jump, he was responsible for the Ohio Government, Education and Medical ("GEM") segment.  However, by mid-2002,[1] Jump felt he needed to "shake up" his department and moved

---

[1]     There is conflicting testimony as to whether the switch was in 2002 or 2003.  However, it appears from exhibits that Marwaha was already working in LBS at least by January 2003.

Marwaha to large business accounts ("LBS" or "Enterprise").[2]  LBS sales were challenging

because 26 large Ohio businesses had declared Chapter 11 bankruptcy in 2002.

In fall of 2003, Jump had Marwaha participate in a "360" evaluation.[3]  This is a

comprehensive review process where both comments and numbered rankings are provided by

the participant's boss, direct reports, peers and other staff.  The reviews and statistics revealed

both positive and negative aspects of Marwaha's performance, and given the lack of a reference

point the Court is unable to conclude whether the results were ultimately favorable.  In any

event, Jump gave Marwaha scores far below those submitted by the other reviewers.  Indeed, in

approximately 50 categories the Court cannot identify a single ranking by Jump that was equal to

or greater than the average from the rest of the evaluators.

Marwaha was transferred yet again in January 2004.  He was transferred back to GEM

but this time as the director in charge of GEM "Winback."  Winback means lines that SBC had

lost to other providers and wanted to win back as customers.  Although Jump was vice president

of Enterprise by that time and there was a separate GEM vice president (Debra Moore), Jump

nonetheless continued to supervise Marwaha.

Marwaha was assigned both a sales goal and a back on network ("BON") goal.  The sales

numbers were self-reported while BON measured how many lines SBC had actually obtained

---

[2]     Marhawa claims that this was on 24 hours notice.  However, the
cited testimony of Jump does not support this contention.

[3]     SBC notes that 360 evaluations are done for development rather
than performance purposes.  Jump also stated that Marwaha's 360
was for development only.  Chris Butterfield, the organizational
development consultant who conducted the 360 review, also
"coached" Marwaha for a number of months.

3

back on its network.  Once a sale was made the correct paperwork had to be filed with other departments for the actual line transfer to occur.  As will be discussed in more detail below, Marwaha's self-reported sales numbers were consistently much higher than the BON numbers.[4] SBC faults Marwaha's execution in turning sales into lines BON, while Marhawa charges that other SBC departments failed to process orders from his department.

Marwaha was assigned a 2004 sales goal of 31,155 lines and a 2004 BON goal of 26,013 lines.  Dan McCormack's Enterprise group was assigned a BON goal of 27,333 lines.  Finally, the Signature Winback group had a BON goal of 59,973.  David Conley was a member of this group.  Although Marwaha's GEM group had the lowest BON goal in terms of total lines, the parties spend a great deal of time (including various motions to strike, discussed *infra*) disputing the year-over-year percentage increase that those numbers represent.  Marwaha claims that the 2003 GEM Winback BON total was 10,425, while in 2003 Enterprise and Signature achieved a Winback BON total of 18,871 and 38,000.  Based on these numbers, Marwaha claims his 2004 goal represented a 250% increase, while Enterprise and Signature were only expected to post increases of 145% and 158%, respectively.

SBC responds that Marwaha's numbers were compiled prior to a corporate reorganization from east, west and central divisions to an industry group structure.  Accordingly, the 2004 goals were allegedly based off of restated values rather than the numbers cited by Marwaha.  Although SBC has provided evidence that such a reorganization took place, as is discussed *infra*, it has not provided competent evidence as to what those 2003 restated numbers

---

[4]     BON is expected to come in at about 80% of sales.  Marwaha's rate was much lower than 80% throughout his time in the Winback position.

were.

It is undisputed that in 2004 GEM Winback achieved 12,934 BON lines, Enterprise Winback achieved 17,035 BON lines and Signature Winback achieved 41,331 BON lines.  In absolute terms Marwaha only made 49.72% of BON goal versus 62.32% for Enterprise and 68.91% for Signature.  Marwaha asks the Court to look beyond these numbers to consider year-over-year percentage increase.  Based on Marwaha's 2003 numbers, this results in a 124% year-over-year improvement for Marwaha versus a 108% increase for Signature and a 90% increase for Enterprise.

In practice SBC measured Marwaha's performance against his 2004 BON goal, which it quickly became apparent that he was not meeting.  By July 2004, SBC decided it would be more efficient to place Marwaha's GEM Winback group under the supervision of Moore,[5] the GEM vice president.  Moore then met with Marwaha and his management team.  In an e-mail from Moore to her boss, Cathy Coughlin, she noted a number of observations about Marwaha and his team: 1) a lack of leadership; 2) fundamental issues with other departments in getting BON sooner; 3) lack of knowledge of their 30/60/90 day objectives; 4) lack of "tracking in place mapped to their third quarter initiatives"; and 5) some valid presale concerns that needed to be fixed.  Coughlin responded to Moore the next day as follows:

> Debra-Given what you have found, I would like to have a serious discussion about Rob.  For management employees not to know their objectives, not to have tracking in place and not to have activity metrics at this point in the year is inexcusable.  Rob has been in every director and above meeting that I have held not to mention the meetings that he has been with Brian and you throughout the

---

[5]     Prior to the switch, the unit count of GEM Winback lines BON was attributable to Jump, while Moore was responsible for profit and loss for GEM Winback.

> year.  I don't think we can be any more clear about daily activity, daily
> inspection, etc.  I will ask Jeannie to get a quick call together - I am ready to
> move on Rob - we can't afford to have people at the director level who do not
> lead. - Cathy

Coughlin's e-mail was also sent to Jump, Eliska Paratore from human resources and Jeannie Nelson.  Moore e-mailed Marwaha later that day explaining that it "is critical . . . that you follow up on the management issues that we discussed[.]"

On August 2, 2004, Moore and Paratore participated in a telephone call with Marwaha. Paratore summarized that conversation in an August 9 e-mail explaining, *inter alia*, that Marwaha's group did not have "the level of activity and inspection needed to achieve their numbers."  In response to his complaints that the GEM Winback goals were too high, she and Moore responded that the objective was obtainable "[r]egardless of how the number was finally set[.]"  The e-mail then laid out a number of "Expectations/Deliverables" for Marwaha and his group.

Marwaha continued to complain that his 2004 objective was too high. Moore looked into the numbers and determined that they were in line with the plan.[6]  Marwaha also complained that other departments were delaying getting lines he sold placed back on network.  According to SBC's Robyn Garland, she met with Moore and Marwaha in October 2004 to determine the current backlog in getting GEM Winback lines BON.  As of that time there was no backlog.

Moore e-mailed Marwaha on November 1 "as a follow up to our discussion last week

---

[6]     Although it is not apparent that this was communicated to Marwaha, Moore explained that the 2003 numbers Marwaha was relying on did not include all Winback customers: "In '04, we put more customers into the – into the Winback program."  Moore Dep., p. 129, ln. 8-9.

6

with you, Robyn Garland and myself, [where] I asked you, for the last time, to clarify for me what you are reporting week over week. . . .  As of today you still have not responded to my request for clarity and closure!"  She indicated a number of issues, including a lack of "confidence the appropriate leadership direction for the winback team for year end is on a positive trend to deliver expectations. . . .  I am very disappointed that you still acknowledge you do not know how you are managed - at your level you should!"

Moore placed Marwaha on a Performance Improvement Plan ("PIP") in November 2004. The PIP was "developed due to unacceptable results for the year to date period from January through September 2004.  During this timeframe, you have missed your line objective every month and have missed your BON objective all but one month."  Moore indicated four areas where her "concern and direction for improvement has never changed": 1) achieve BON objective; 2) consistent contribution from the entire management team; 3) a log of 2 customer meetings per week; and 4) accurate monthly forecasting.  "[F]ailure to meet and sustain these expectations will result in further disciplinary action up to and including termination of employment."  The PIP form includes a section for employee comments.  Marwaha stated that "I strongly feel that my objective for 2004 was too high" and that the "Objective for 2004 was set 296% higher than the 2003 attainment."

While Marwaha was on the PIP, he heard rumors that his position was being folded under a director the next year.  The rumor turned out to be true.  On December 6, SBC announced that he would continue in GEM Winback but would report to Tony Mokry,[7] director of Signature

---

[7]     Marwaha claims that Mokry was less qualified.  Mokry did not
        have a bachelors degree, had less seniority, and no commercial
        Winback or GEM experience.

7

GEM Sales.  Although he would no longer be a director, his pay remained the same.  The change was to be effective January 1, 2005.  In the meantime, Marwaha failed to meet his November goals.  On December 13, Moore informed Marwaha that he had not met her expectations and that she would contact the human resource manager, Kris Leonard, about the "next steps."

On December 14, Marwaha contacted SBC's ethics hotline to report discrimination. Marwaha had previously discussed employment issues with Kris Leonard but felt that those efforts had gone nowhere.  Although Marwaha indicated that he did not want his complaint discussed with Leonard, Leonard was apparently aware of the issue.  James Simmons, who eventually passed the complaint on to human resource specialist Bruce Hacker for investigation, discussed the issue with Leonard and had some "high level information" regarding Marwaha.

Hacker eventually conducted an extensive interview of Marwaha, who explained that Jump had set and Moore had demanded unrealistic numbers.  He sought an investigation of the unreasonable numbers that Moore and Jump had demanded of him.  He believed that the unrealistic targets and his being singled out for failing to meet those targets was a result of his national origin.  Marwaha also identified the 2003 bathroom incident, the 360 review and the Jump conference calls as instances of discrimination.  Although he could not identify any overtly discriminatory episodes, he had a feeling that the disparate treatment was result of discrimination.

For 2005 the GEM Winback goal was revised significantly downward.  Whereas Marwaha's 2004 goal had been 26,013 BON, his 2005 goal (and the goal for his eventual Caucasian successor Leonard Salva) was only 13,050 BON.  This was less than 1% over Marwaha's actual 2004 attainment, and barely half of the 2004 goal.  SBC avers that numbers are always based on the previous year's performance; thus, Marwaha's performance in 2004

resulted in the low baseline.  SBC attributes the lack of a significant percentage increase to other unspecified factors.[8]

By January 1, Marwaha was working under Mokry and no longer subject to the Moore PIP.  Accordingly, when Hacker approached him on January 17 seeking permission to talk to Jump about the rationale for the 2004 goal, Marwaha felt it was unnecessary to continue with the investigation of discrimination at that time.  However, Marwaha soon ran into problems with Mokry.  Although his self-reported sales numbers exceeded goal, his BON numbers were only at 63% of his January 2005 objective.

In February, Mokry placed Marwaha under yet another PIP.  The February PIP included goals of meeting his February BON requirement, placing low-performing direct reports on a PIP, creating a plan to eliminate backlog, and generally increasing sales activity.  The PIP was based on "unacceptable results" including only 63.77% attainment of 2004 line goal, 49.72% attainment of 2004 BON goal and 63.7% attainment of the January 2005 BON goal.[9]  Plaintiff complained to both Hacker and Leonard about the latest PIP.  In a February 9 e-mail, Marwaha told Hacker that "[i]t seems I am being targeted to be dismissed from my job.  I was at 103% of attainment for January[.]"[10]

Marwaha also contacted Ken Fenoglio, an HR vice president, explaining that the GEM

---

[8]     As will be discussed in more detail below, Marwaha could not even meet this significantly lowered goal in January and February 2005.  Salva, Marwaha's replacement, was nonetheless able to achieve over 100% of the 2005 GEM Winback goal.

[9]     The January 2005 BON goal was only 1,165.

[10]    The 103% attainment was the self-reported sales number versus the actual BON number of 63.7%.

9

objective for 2005 was 13,050 BON lines versus 26,013 BON lines in 2004.  Fenoglio forwarded Marwaha's request to look into the numbers to Paratore who in turn forwarded the request to Leonard, seeking Marwaha's Winback target for 2003, 2004 and 2005 and Marwaha's "official attainment (not self reported)."  A later e-mail also asked if "Rob is really at 125% of his February attainment."  Leonard responded that Marwaha was at 37% (240 vs. 642 goal) for BON month-to-date and also provided 2004 GEM Winback numbers.  Even Marwaha admits that his "BON for February 2005 was 479 against a goal of 1,110.  This put him at 43% month-to-date and 54% year-to-date."[11]

By February 28, Mokry had concluded in an e-mail to Leonard and Moore that "[b]ottom line Rob has failed to execute on his PIP."  Mokry cited the following:

- Audited 4th quarter lines were [sic] there are still over 2,000 lines that are not BON this data took over 1 month to get.
- In terms of January Rob has missed over 2 commitments to schedule appointments with me to visit customers.
- Rob has no accurate tracking as it relates to getting orders BON.  He advised us he understands the BON number.  His tracking is unacceptable and continues not to be accurate.  Over 50% of his orders from January have not been processed because of his tracking.

Mokry attached a lengthy document recounting Marwaha's failures to meet PIP requirements.  Mokry's letter concluded that "I would like to close his PIP out with termination." Marwaha was terminated on March 2, 2005.

Marwaha believes that Caucasian counterparts McCormack and Conley were not disciplined in spite of inferior performance in 2004.  In absolute terms, Marwaha's 2004

---

[11]     Marwaha faults Leonard for presenting BON numbers rather than Marwaha's self-reported sales number of 131%.

10

production was the lowest.[12]  However, based on the assumption that Marwaha's 2003 numbers provide an appropriate baseline, his 2004 goal was more challenging[13] and his year-over-year performance was better.[14]

SBC explains that Conley was not actually in charge of Signature Winback and that no single individual held that position.  It next notes that McCormack did not report to the same managers as Marwaha. McCormack reported to another director-level manager who in turn reported to Jump.  Finally, SBC explains that despite performing better than Marwaha, McCormack also faced discipline.  He received a PIP in August 2004 and was also demoted in the middle of 2005.

The parties have filed cross-motions for summary judgment.  Plaintiff seeks summary judgment on Count I for discrimination and Count III for retaliation.  Defendant seeks summary judgment on Count II for a hostile work environment in addition to Counts I and III.  Count IV for public policy was dismissed voluntarily.  (Doc. 39).

**STANDARD OF REVIEW**

In accordance with Federal Rule of Civil Procedure 56, summary judgment is appropriate

---

[12]     Marwaha (GEM Winback 2004)–12,934 BON / 49.72%; McCormack (Enterprise Winback 2004)–17,035 BON / 62.32%; Conley (Signature Winback 2004)–41,331 BON / 68.91%; Salva (GEM Winback 2005)–13,616 BON / 100% BON.

[13]     Marwaha (GEM Winback 2004)–250% increase; McCormack (Enterprise Winback 2004)–145% increase; Conley (Signature Winback 2004)–158% increase.

[14]     Marwaha (GEM Winback 2004)–124% BON; McCormack (Enterprise Winback 2004)–90% BON; Conley (Signature Winback 2004)–108% BON; Salva (GEM Winback 2005)–over 105% BON.

11

when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. UAW Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323. A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985). However, "[t]he nonmoving party must come forward with some significant probative evidence to support its claim. If the nonmoving party fails to make a sufficient showing on an essential element, which it has the burden of proof, the moving party is entitled to summary judgment." *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1001 (6th Cir.

2005) (citing *Celotex*, 477 U.S. at 323-24).

**DISCUSSION**

In addition to their cross-motions for summary judgment, the parties have also filed various evidentiary motions.  The Court will address the evidentiary matters first.

Defendant's Motion to Strike

Defendant seeks to strike Plaintiff's exhibits 1, 3, 12a-12c, 34, 80-97, 99, 100, 113, 139 and 149.  Defendant argues that exhibits 1, 3, 34, 113, 139 and 149 were not properly authenticated, exhibits 1, 3, 34, 80-97, 99, 100, 113, 139 and 149 contain inadmissible hearsay, and exhibits 12a-12c are not based on admissible data and are not proper charts, summaries or calculations under Rule 1006.

Marwaha first contends that Exhibits 1, 3, 34, 99 and 113 are admissible because SBC submitted them with its papers or because similar content has not been objected to elsewhere.  First, Marwaha cites no authority for the latter proposition that the failure to object to the contents of a first exhibit somehow waives any objections to a second similar exhibit.  Second, SBC submitted the exhibits to the Court because they were attachments to deposition transcripts, not because they were relied upon in its cross-motion.  The Court will not penalize SBC for submitting the complete transcripts along with attached exhibits where Marwaha has not demonstrated that SBC relied on those exhibits in any way.

With respect to authentication, Marwaha notes that SBC stipulated to the authenticity of exhibit 113.  SBC did not contest this in its Reply.  SBC employees testified that Exhibits 1, 3 and 34 are SBC forms but could not attest to the numbers on the forms.  Marhawa filed an affidavit confirming that he received each of these documents while working at SBC.  Exhibit 139 is an SBC Business Sales Quota Practices guide that outlines certain SBC business practices.

13

Marwaha averred that he received this while he was at SBC also.  Finally, Marwaha received

Exhibit 149 in response to document requests and SBC confirmed in interrogatory answers that

this was an SBC document. The Court is satisfied that documents 1, 3, 34, 139 and 149 are in

fact what Marwaha contends under Fed. R. Evid. 901.

SBC next contends that exhibits 1, 3, 34, 80-97, 99, 100, 113, 139 and 149 contain

inadmissible hearsay.  The parties dispute whether these documents are admissions of a party-

opponent under Fed. R. Evid. 801(d)(2).

Although "[t]he contents of the statement shall be considered [they] are not alone

sufficient to establish" authority or the scope of an employment relationship.  Fed. R. Evid.

801(d)(2).  Here, the contents of the documents along with SBC admissions demonstrate that the

documents qualify as admissions of a party-opponent.  Exhibits 1, 3, 34, 100, 139 and 149 are

SBC forms that Marwaha received as part of his employment from individuals within SBC.  The

statements in exhibits 80-97, 99 and 113 were given by each employee as part of the 360

evaluation.  As for these statements, Marwaha has explained elsewhere through testimony the

context of the 360 review.  Each of exhibits 80-97, 99 and 113 consist of interview notes and

rankings from the 360 assessment process.  The interviewer had authority to conduct the

interview and each interviewee was asked questions and provided rankings appropriate to their

relationship (peer, direct report, boss) with Marwaha.

Finally, SBC challenges exhibits 12(a)-12(c).  Exhibits 12(a) and 12(b) are simple bar

graphs of the year-over-year increase in Winback BON goal and actual performance for

Signature, Enterprise and GEM.  Exhibit 12(c) is a simple bar graph of Winback BON

performance based on SBC's 2004 goal.  To the extent that Marwaha is attempting to introduce

these as evidence under Rule 1006, the underlying data is neither voluminous nor difficult to

examine.  However, the bar graphs are accurate representations of performance based on

Marwaha's 2003 baseline numbers and may be presented for purely demonstrative purposes.

Accordingly, Defendant's motion to strike is DENIED.

Plaintiff's Motion to Strike

Marwaha asks the Court to strike exhibits 1, 5, 8, 9, 13, 14 and 18 to SBC's motion for

summary judgment[15] and award costs and attorney's fees incurred in bringing his motion to

strike.  All of the exhibits at issue are declarations of SBC witnesses.  Marwaha contends that the

declarations are self-serving, not based on personal knowledge and contradictory of sworn

testimony.  Each of the declarations will be addressed in turn.

Under Fed. R. Civ. P. 56(e) a declaration must be made on personal knowledge.  The

Sixth Circuit recently clarified how district courts should assess allegations that a declaration

contradicts earlier testimony:

> [A] district court deciding the admissibility of a post-deposition affidavit at the
> summary judgment stage must first determine whether the affidavit directly
> contradicts the nonmoving party's prior sworn testimony.  A directly
> contradictory  affidavit should be stricken unless the party opposing summary
> judgment provides a persuasive justification for the contradiction.  If, on the other
> hand, there is no direct contradiction, then the district court should not strike or
> disregard that affidavit unless the court determines that the "affidavit constitutes
> an attempt to create a sham fact issue."

*Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908-909 (6th Cir. 2006) (internal citations

omitted).

Eliska Paratore was the executive director of human resources for SBC BCS midwest

---

[15]     Marwaha also asks the Court to strike exhibits 1, 3, 5, 11, 16 and
17 of SBC's memorandum in opposition to Marwaha's motion for
summary judgment.  These are all similar to the exhibits filed in
support of SBC's motion.

from 2003 through 2005.  She avers that Cathy Coughlin was a vice president until mid-2003 when she became president of SBC BCS.  Marwaha argues that this conflicts with other record evidence (interrogatory responses) to the effect that Jump and Moore were vice presidents before 2003.  Not only are these assertions not necessarily contradictory but Marwaha does not explain why the declaration cannot conflict with other evidence.  Marwaha next takes issue with Paratore's recollection of a telephone conference.  However, her averment that Moore expressed her concerns and expectations to Marwaha in the phone conference is not inconsistent with her testimony that she did not know the details of Marwaha's objectives.  Marwaha also seeks to strike a paragraph in which Paratore generally discusses the process by which Marwaha and McCormack were eventually demoted to associate director.  Marwaha contends the paragraph is hearsay and conflicts with other evidence produced in the case.[16]  Marwaha is wrong on both counts.  Paratore avers to the events that eventually resulted in the demotions, including the fact that documents were exchanged.  She does not even attempt to discuss the contents of those documents.  Nor does Marwaha's evidence that McCormack was a director during 2005 preclude the possibility that McCormack was eventually demoted to associate director that year.  Finally, Marwaha's attempt to strike paragraph 20 of Paratore's declaration as contradictory of deposition testimony will also be rejected.  Paratore's testimony that in her role in HR she "can't tell you about how 360s are being done at SBC" is in fact consistent with her averment that "[a] 360 review is not a disciplinary action and the results of the review are not shared with the Human Resources Department."

---

[16]    Marwaha also contends that Paratore's declaration refers to documents that were wrongly withheld during discovery.  This issue is discussed in more detail *infra* where the Court addresses Marwaha's motion for default judgment.

16

Marwaha also asks the Court to strike paragraphs 3 and 5 of Jump's declaration.  Jump originally testified that McCormack reported to him in 2004 and that he did not know if Conley was Signature Winback director in 2004.  His declaration states that Conley was not Signature Winback director in 2004 and that McCormack was not a direct report.  These statements are not directly contradictory nor is there an attempt to create a sham issue.[17]  McCormack reported to Jump even if he was not a "direct" report and Jump was later able to recall Conley's position in the company.  Marwaha contends that Jump is merely attempting an end-around the hearsay rules because Jump admits that he referred to documents before giving his declaration.  However, this was akin to refreshing his recollection of matters that were certainly within his personal knowledge at one time.[18]

Nonetheless, the Court agrees that a litigant cannot avoid the hearsay rule by reading a document then "declaring" the contents of the document as within their personal knowledge.  This is the main issue with the Pettinger declaration.  Pettinger was a Senior Finance Manager in the SBC BCS Midwest finance department in 2003—the time that Marwaha's 2004 GEM Winback goal was set.  She avers that one of her responsibilities was planning for purposes of setting the GEM segment's financial goals.  The financial objectives set by the finance department are primarily based on the previous year's financial trending, although marketing and

---

[17] Marwaha has not pointed to directly contradictory cross-examination.  Moreover, Jump avers that he did not have access to certain evidentiary materials at the time of his earlier examination. *Aerel*, 448 F.3d at 909

[18] Marwaha makes the same arguments in attempting to strike Kris Leonard's declaration that "[i]n 2004, BCS Midwest did not have a dedicated director of winback for the Signature segment."  These arguments are rejected for the same reasons.

pricing initiatives as well as new products may also be considered.

Pettinger declares that the finance group restated 2003 results because of a corporate realignment for BCS Midwest.  Units that were previously organized geographically were reorganized as Enterprise, GEM and Signature.  President Coughlin then set an overall Winback goal of 36.9%.  Although Marwaha takes issue with all of Pettinger's declaration, it is only from this point forward that the Court finds Pettinger's declaration problematic.  In the following paragraphs she sets out the restated 2003 results, 2004 objectives and percentage increase based on the restated numbers.  However, she only calculated these values during litigation and did so from a series of undisclosed documents that are not in evidence.  SBC even admits that the values in her declaration are based on "information gleaned from a review of finance department records."

As noted in the *Albright v. Virtue* case cited by SBC, Rule 56(e) generally requires documents referred to in a declaration to be attached to the declaration.  273 F.3d 564, 574-75 (3rd Cir. 2001).  A court may nonetheless consider the declarations to the extent they do not depend on the documents.  Thus, SBC is correct that as the "member of the finance department responsible for setting the GEM goals and objectives" Pettinger "has the required personal knowledge to testify about the *process* used to set these objectives."[19]  (Emphasis added).  However, where the data Pettinger used to calculate the restated numbers and objectives is admittedly derived solely from other documents not in evidence, she cannot avoid the problem by testifying to the results.  Accordingly, the restated 2003 results provided in the Pettinger

---

[19]    The Court rejects Marwaha's other attacks on the Pettinger affidavit.  She is competent to testify as to the other matters stated therein.

18

declaration will not be considered.

Marwaha also seeks to strike the declaration of Robyn Garland regarding backlogs in getting lines BON in 2004.  Marwaha first argued that Garland was not initially disclosed as a witness by SBC.  However, Marwaha himself identified Garland as a witness in his own disclosures.  Marwaha also claims that her testimony contradicts other evidence in the record.  However, Marwaha merely cites to his own attempts to determine the Winback backlog and to evidence that fewer people were assigned to process GEM Winback orders than to other groups.  Neither of these facts, if true, would contradict Garland's declaration.

Marwaha next seeks to strike the Hacker declaration as inconsistent with other evidence.  Hacker explained in his declaration that Marwaha did not wish to continue the investigation into his 2004 objectives.  Hacker's notes similarly state "[a]t this time not sure he sees any need to continue to pursue how the numbers were set."  His declaration and notes also similarly state that Marwaha would contact Hacker if any future acts might indicate that he was being treated unfairly.  The Court simply cannot identify anything contradictory or any basis for striking the testimony.

Finally, Marwaha seeks to strike the declaration of Dan McCormack.  McCormack states that he was placed on a PIP in 2004 and that his title changed from director to associate director in 2005.  Marwaha's argument that McCormack's statement regarding his change in title is inconsistent with other evidence is baseless.  All indications are that McCormack was demoted in 2005, just as he stated.  Marwaha next explains that the PIP was not produced in response to a proper request for production.  This contention will be addressed below with respect to Marwaha's motion for default judgment.

Accordingly, Plaintiff's Motion to Strike is GRANTED as to portions of the Pettinger

19

declaration as indicated above.  Plaintiff's request for costs and attorney's fees is DENIED.

Jury    Plaintiff's Motion for Default Judgment or, in the Alternative, for Negative Inference Instruction

Marwaha seeks default judgment or a negative inference jury instruction based on allegations that SBC failed to produce the following in a timely manner: 1) the underlying data utilized by Pettinger to determine the restated 2003 results; 2) other data and reports used to restate the 2003 results; 3) McCormack's 2004 PIP; 4) a formal evaluation of Marwaha and other SBC employees; 5) organizational charts or other materials related to the structure of the Signature segment of SBC; and 6) correspondence with Marwaha relating to a backlog in processing orders.  Marwaha explains that each of these items should have been disclosed as part of SBC's initial disclosures or in response to certain formal or informal discovery requests.  He argues that SBC should be penalized for first disclosing these documents in its summary judgment pleadings to the extent they were disclosed at all.

The simple problem with Marwaha's motion is that many of the documents at issue were not the subject of Marwaha's discovery requests.  SBC's initial disclosures and supplemental initial disclosures merely described and categorized the types of documents it might use. Marwaha did not object to this response and cannot be heard to complain now that the discovery deadline has long passed.  Moreover, broad omnibus discovery requests identified by Marwaha do not relate to these documents.  There is no indication that any of the documents were "relied on" by SBC in formulating its answers to Marwaha's discovery requests.

With respect to categories 1 and 2 above, their nondisclosure is explained by the unique nature of the information at issue.  Marwaha did request *actual* BON and sales objectives and results for the relevant periods.  However, the documents at issue contain restated data that never

20

served as a yearly goal but was used to *calculate* the 2004 actual objectives.  Marwaha simply did not request the underlying data.[20]  As to category 5, Marwaha cannot point to any discovery request seeking information regarding the structure of the Signature segment of SBC.

Regarding McCormack's PIP, Marwaha relies on a document request seeking "[a]ll documents related to the sales goals assigned to all directors . . . reporting to either Brian Jump or Debra Moore for the past four years and their performance in relation to those goals."  If Marwaha wanted disciplinary or performance records of other employees it would have been simple enough to ask for them.  To be sure, nearly every document involving an employee involved in sales can somehow be said to "relate to" a sales goal in some attenuated manner.  However, the Court will not sanction SBC for reasonably concluding that a request for sales goals would require them to produce just that—the documents that set the sales goals—as opposed to every document with a conceivable relationship to sales.

The final two sets of documents are documents that were not produced at all.  Category 4 (the formal evaluation) is really just a dispute over whether SBC's production is complete.  SBC contends that it has produced all of the referenced documents.  To the extent that those documents fail to support SBC's claims that it evaluated Marwaha's performance against other directors this of course helps Marwaha's case—but it is not the basis for sanctions.

Finally, the parties dispute whether they came to an informal agreement regarding backlog information.  Linda Garrett-Allison testified at her deposition that she confirmed in an e-mail to Marwaha that there was no backlog as of February 2005.  Counsel for SBC initially

---

[20]	Of course, because SBC has failed to provide the underlying data to the Court, that data and portions of the Pettinger declaration which refer to that data will not be considered for purposes of this motion.

21

refused to produce the e-mail as beyond the scope of Marwaha's discovery requests.  Following a meeting between counsel during a status conference before this Court, Marwaha's counsel laid out via e-mail an agreement whereby he would not seek the e-mail if SBC would not contest that a backlog existed in lines to be processed.  The only response of counsel for SBC at the time regarding this issue was that "we will not attempt to respond to each point . . . ."  Marwaha now believes that SBC has reneged on its "agreement" by introducing the Garland declaration.  The fact is that SBC did not agree and the Court cannot be called upon to police such ambiguous agreements.  Because the e-mail was not within the scope of Marwaha's discovery requests,[21] SBC's failure to produce the e-mail cannot result in sanctions.

Finally, Marwaha is not entitled to costs or attorney's fees.

<u>Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment and Plaintiff's Motion to Strike Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment</u>

These motions rely on the same grounds as Plaintiff's Motion to Strike and Motion for Default Judgment or, in the Alternative, for Negative Inference Jury Instruction.  Because those Motions will only be granted in part, there is no basis to strike SBC's motion or opposition brief.  Moreover, Marwaha is not entitled to costs or attorney's fees.

<u>Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Judgment</u>

The Court will address the cross-motions for summary judgment together.

---

[21]     Having reviewed the parties' discovery letters, the Court agrees that the asserted document requests did not cover the Garrett-Allison e-mail.

<u>Count 1 - Race or National Origin Discrimination</u>

Plaintiff's state race or national origin discrimination claim (Count 1), brought under

R.C. § 4112.02, is addressed under the same *McDonnell Douglas* framework utilized under

federal anti-discrimination laws.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973);

*Leadbetter v. Gilley,* 385 F.3d 683, 690 (6th Cir. 2004); *Mitchell v. Toledo Hosp.*, 964 F.2d 577,

582 (6th Cir. 1992) (noting that Ohio state law claims are governed by the *McDonnel Douglas*

framework); *Byrnes v. LCI Communication Holdings Co.*, 672 N.E.2d 145, 148 (Ohio 1996)

(noting that Ohio state law claims are governed by the *McDonnell Douglas* framework).  The

plaintiff bears the initial burden of setting forth a *prima facie* case of discrimination.  *McDonnell*

*Douglas*, 411 U.S. at 802.  The Supreme Court established the four-part test for *prima facie*

discrimination as follows:

> (1) plaintiff was a member of the protected class;

> (2) plaintiff suffered an adverse employment action;

> (3) plaintiff was qualified for the position either lost or not gained; and

> (4) a person not of the protected class was treated differently than the plaintiff.

*Id.*

A presumption of discrimination arises once the plaintiff sets forth a *prima facie* case.

The burden then shifts to the defendant, who must produce admissible evidence which, "if

believed by the trier of fact, would support a finding that unlawful discrimination was not the

cause of the employment action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

The presumption of discrimination dissolves upon the defendant's presentation of any

nondiscriminatory basis for ending the plaintiff's employment.  *Id*.  The plaintiff then must

demonstrate that the defendant's stated reason was a pretext for impermissible discrimination.

23

*Id*. at 507-08.  The plaintiff retains the ultimate burden of persuading the trier of fact that he has

been the victim of intentional discrimination.  *Id*. at 508.

SBC's motion focuses on the fourth element of Marwaha's *prima facie* case.  SBC

contends that Conley and McCormack are not "comparables."  "It is fundamental that to make a

comparison of a discrimination plaintiff's treatment to that of non-minority employees, the

plaintiff must show that the 'comparables' are similarly-situated in all respects".  *Mitchell v.

Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992).  Here, Conley and McCormack were not

comparables for at least three reasons.  First, Marwaha's performance fell well below that of

Conley and McCormack, even though his goal was the lowest in 2004, and based on the poor

2004 performance, even lower in 2005.  Nonetheless, Marwaha seeks to shift the focus from his

failure to meet his goals to the ways the goals were set.  However, the 2003 figures Marwaha

relies on are presented without any context or explanation.  The only explanation comes from

SBC, which has provided affidavits and testimony explaining that the group Marwaha was

responsible for in 2004 included business segments not included in the 2003 numbers he has as

the baseline.  Second, assuming *arguendo* that Marwaha's version of the numbers is correct,[22]

"to  be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare

his/her treatment must have dealt with the same supervisor . . . ."  *Id*.  Conley never held a title as

director of Signature Winback and McCormack, despite his director title, reported to Jump

through Brian Clark.  There is no evidence that Conley or McCormack reported directly to

_____

[22]     Plaintiff occasionally mentions Salva in his motion, but as far as
the Court can tell does not contend that he is a comparable
employee.  Indeed, he could not be since he replaced Marwaha.
Regardless, Salva was able to meet the 2005 goal that Marwaha
completely failed to meet in January and February.

24

Moore or Mokry.  In all instances where Marwaha faced negative job action he reported to Moore and Mokry.  Third, Marwaha and the alleged comparables were not "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Id*.  To the extent that numbers were the problem, McCormack was also placed on a PIP.  However, in Marwaha's case both Moore and Mokry had other serious concerns about Marwaha's performance.  They cited problems with leadership, supervised employees, client contacts and understanding objectives.  There is no evidence that Conley or McCormack had similar performance issues.

Although "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated' . . . , the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'"  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994)).  Here, Marwaha's inferior performance in meeting his goals, other performance issues and the fact that these issues were evaluated by different supervisors are all relevant differences that preclude the consideration of the other employees as comparables. Accordingly, Marwaha cannot state a *prima facie* case of discrimination.

Even assuming that Marwaha could establish a prima facie case, SBC has also demonstrated a nondiscriminatory basis for terminating Marwaha.  However his objectives were set for 2004 and 2005, Marwaha clearly did not meet them.  In 2005, in fact, the objective Marwaha was given was barely half of his 2004 objective.  Marwaha does not argue that this 2005 objective was unreasonable.  Nonetheless, he still did not come close to meeting the BON requirements in January and February 2005.  Although the February 2005 PIP also noted

25

Marwaha's 2004 numbers, it was the continued failure to meet goals in 2005 that resulted in Marwaha's termination.  In addition, as discussed above, both Moore and Mokry expressed other concerns about Marwaha's performance.

Nor is Marwaha able to demonstrate that SBC's asserted reasons were pretext for unlawful discrimination.  In order to establish pretext, the plaintiff must show "by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the employment action], or (3) that they were insufficient to motivate [the employment action]."  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (explaining that an employment decision will not be considered pretextual if the employer had an honest belief in a nondiscriminatory rationale and based its belief on particularized facts).  Marwaha essentially repeats his laundry list of allegations against SBC and concludes that any SBC rationale "would be specious and replete with indicia of mendacity." However, based on the evidence presented, Marwaha was being disciplined for a failure to meet the standards set out in the PIPs, i.e., lack of leadership, failure to understand objectives, lack of tracking, lack of accurate monthly forecasting, and failure to contact two customers a week.  Nor has Marwaha presented evidence that they did not have a good faith belief that the 2004 and particularly the 2005 goals were proper.  Accordingly, Marwaha cannot demonstrate pretext.

In sum, Marwaha cannot make out a *prima facie* case of discrimination, SBC has demonstrated a nondiscriminatory basis for the employment action, and Marwaha cannot demonstrate pretext.  The Court therefore concludes that SBC is entitled to summary judgment as to Count 1.

Count 2 - Hostile Work Environment

26

In order to prove a case of a hostile work environment, Marwaha must establish the following five elements: 1) he was a member of a protected class; 2) he was subjected to unwelcomed harassment; 3) the harassment was based on race or national origin; 4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).  A hostile work environment involves "discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal citations omitted).

SBC argues that its conduct was not sufficiently severe or pervasive and that there is not sufficient evidence that the asserted conduct was based on Marwaha's race or national origin.  The Court agrees.  Marwaha responds to SBC's motion as follows: "Jump chastised Marwaha publicly; Moore went out of her way to harass Marwaha outside of business hours and to secretly undermine his authority; and SBC set Marwaha up for failure."  However, none of the underlying incidents—early evening phone calls, "curt" treatment on conference calls, or even the one incident of Jump accosting Marwaha in a public bathroom—rise to the level that courts have found to be severe or pervasive and none appear to have anything to do with Marwaha's race or national origin.  *See Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (discussing an environment where a racial epithet was used against the plaintiff and where a workplace had "an abundance of racial epithets and racially offensive graffiti").  Accordingly, SBC is entitled to summary judgment on the hostile work environment claim.

<u>Count 3 - Retaliation</u>

Both parties have moved for summary judgment on Marwaha's retaliation claim.  In

27

order to establish a prima facie case of retaliation, a plaintiff must show that: 1) he engaged in protected activity; 2) the exercise of his rights was known to the defendant; 3) thereafter, the defendant took an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action. *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 412 (6th Cir. 1999). SBC challenges the second and fourth elements of Marwaha's retaliation claim.

Marwaha complained of possible discrimination a number of times, including the formal complaint to the ethics hotline of December 14, 2004. After that complaint there is no other evidence of complaints with respect to discrimination that would form the basis for a retaliation claim.[23] The adverse employment action taken after the December 2004 complaint was taken by Mokry who was unaware of any of Marwaha's complaints. He had already been placed on a PIP prior to the December complaint which calls into question whether there is a causal connection. Where the decision maker is unaware of the complaint a plaintiff has not made his prima facie case. *Johnson v. United States Dep't of Health & Human Servs.*, 30 F.3d 45, 47 (6th Cir. 1994).

Accordingly, the Court concludes that plaintiff has not provided evidence necessary to make his prima facie case of retaliation and summary judgment is appropriate on Count 3.

**CONCLUSION**

For the forgoing reasons, Plaintiff's Motion for Summary Judgment is DENIED and

---

[23]    After he was subjected to the second PIP Marwaha contacted a number of people complaining that he was placed on the PIP. None of these communications appear to be connected to reporting of a protected activity. Most of Marwaha's statements simply contended that he was meeting his numbers. Although he felt "he was being targeted to be dismissed from [his] job" he did not indicate that this had anything to with discrimination.

28

Defendant's Motion for Summary Judgment is GRANTED. Summary Judgment is GRANTED in Defendant's favor as to Counts 1, 2 and 3 of Plaintiff's Complaint. Defendant's Motion to Strike Exhibits is DENIED. Plaintiff's Motion to Strike Exhibits is GRANTED in PART. All other pending motions and requests are DENIED.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 10/6/06